IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| JOSEPH LEE THOMAS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 09-0700-CV-W-ODS |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying disability insurance and supplemental security income (SSI) benefits. The Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff is a 43-year-old male smoker with an 11th-grade education and an employment history as a truck driver and a construction worker. Plaintiff claims he is disabled because of his knees.

On April 19, 2005, Plaintiff reported right knee pain stemming from a motor vehicle accident in February 2005. The pain was associated with exertion; Plaintiff treated his pain with rest and Motrin. The doctor noted Plaintiff walked with a normal gait, but he had decreased flexion in his knee. The doctor ordered 6 weeks of physical therapy and continued Motrin for pain.

Plaintiff attended physical therapy through May 18, 2005. Although treatment records indicate Plaintiff missed his last appointments, he reported on June 2, 2005, during his follow-up visit to his doctor that he was still going to physical therapy and that it was helping. Plaintiff later explained he quit going to physical therapy because he

could not afford it.  The doctor noted Plaintiff was still experiencing decreased flexion in his right knee, but it was improved since the last visit.  Plaintiff's diagnosis was "most likely" gastrocnemius strain (calf muscle strain); more physical therapy was ordered.

Plaintiff visited the Truman Medical Center emergency room on October 31, 2006, complaining of "serious pains" in his right knee.  An x-ray revealed mimimal degenerative joint disease, and Plaintiff was diagnosed with right knee sprain.  Plaintiff returned to the emergency room just 2 days later and was walking with difficulty.  The nurse practitioner's impression was that Plaintiff was suffering from arthritis.  Plaintiff was advised to continue taking ibuprofen and was given a prescription for Ultram, which was later switched to Flexeril (a muscle relaxant).  During an emergency room visit shortly later, Plaintiff was observed walking with a cane.

On January 5, 2007, an MRI of Plaintiff's knee revealed a tear of the anterior horn of the lateral meniscus (cartilage in the knee).  The MRI also revealed mild to moderate lateral femorotibial chondromalacia (softening and breaking down of cartilage), with "[m]inimal mild fluid . . . seen in the region of the medial meniscus."  At a medical appointment on January 26, 2007, Plaintiff reported the Motrin and Flexeril were ineffective.  Plaintiff was prescribed Tylenol 3 and referred to orthopedics.

At his orthopedic appointment, Plaintiff stated his *left* knee was injured during the vehicle accident and was more bothersome to him than his right knee.  Plaintiff experienced pain in his left knee and described a "locking sensation."  Plaintiff also reported stiffness in his knee if he remained in a flexed position for any length of time.  Plaintiff was assessed with a lateral meniscus tear of the left knee and an arthroscopy was scheduled.

During the arthroscopy of Plaintiff's left knee, the surgeon, James J. Hamilton, M.D., found Plaintiff's lateral meniscus to have a "longitudinal tear at the posterior horn."  The tear was "debrided sharply" and the meniscus was shaved "back to a stable and smooth rim."  Dr. Hamilton also noted "[o]uterbridge grade 2 chondromalacia of the medial and lateral patellar facets"; the surgeon treated this with chondroplasty (surgery of the cartilage).  Plaintiff was discharged with a prescription of Vicodin and was allowed weightbearing and activity as tolerated.

Plaintiff reported poor progress at a follow-up appointment on April 17, 2007. Plaintiff stated he had been ambulatory without assistive devices, but felt no improvement in his left knee pain and noted occasional swelling. Dr. Hamilton noted Plaintiff had good range of motion and instructed Plaintiff to continue working on his range of motion activities. Dr. Hamilton also noted Plaintiff had mild osteoarthritis based on the recent arthroscopy. Dr. Hamilton encouraged Plaintiff to become more active and recommended NSAIDs rather than narcotics for pain.

On May 22, 2007, Plaintiff reported increased pain in his right knee following surgery and complained his right knee was "'locking'" when he mowed the lawn. He also complained that the medication he had taken was ineffective. Both knees reportedly hurt, and the doctor noted Plaintiff "ha[d] difficulty walking and performing simple tasks." Plaintiff was given a Lortab prescription and was encouraged to continue taking Motrin.

After being seen at the orthopedic clinic and participating in physical therapy, Plaintiff returned to Dr. Hamilton. Since Plaintiff's left knee pain had not improved, he was given the option of repeat surgical management or an intraarticular (within a joint) injection of a corticosteroid. Plaintiff chose the injection.

Plaintiff returned to the orthopedic clinic on December 4, 2007, reporting that the pain in his left knee was gone but that he was experiencing repeated and frequent locking episodes. Plaintiff reported that his pain in his right knee was greater than his left knee, but his right knee did not lock. An MRI of Plaintiff's left knee revealed a loose joint body or displaced cartilage. By February 2008, Plaintiff's left knee pain returned and he was also complaining of lumbar back pain that increased with activity.

Plaintiff underwent a second left knee surgery on February 18, 2008. A loose body was removed from the knee by arthroscopy.

At his follow-up appointment on March 12, 2008, the doctor noted Plaintiff was walking with the assistance of a cane. Plaintiff reported he still experienced pain in his knee, and the doctor encouraged Plaintiff to do stretching and range of motion exercises. At his appointment on April 23, 2008, the doctor noted Plaintiff had not done any home stretching or exercises and arranged for Plaintiff to attend physical therapy,

3

which the doctor anticipated would improve Plaintiff's function.

Plaintiff's next appointment was on June 10, 2008. Plaintiff continued to complain of left knee pain and was still observed to be walking with a cane. The doctor noted the physical exam and x-rays did not reveal any underlying abnormality that could be treated surgically and determined "the best options for treatment at this time are medication for pain control in conjunction with an exercise regimen to strengthen the joint."

Plaintiff's friend, Cheryl White, submitted a third-party function report dated August 3, 2008. White stated she and Plaintiff spent most of their time sitting on the porch and attending church. White also stated Plaintiff sometimes was unable to sleep because of his knee and leg pain and that his pain affected his ability to lift, squat, bend, stand, walk, sit, kneel, and complete tasks.

Plaintiff's last two appointments at the orthopedic clinic were in August and November 2008. During his August appointment, Plaintiff reported persistent left knee pain that was dull and achy, but only with activity. The doctor noted that "if [Plaintiff] is sitting and lying supine or watching TV, he has no pain." Plaintiff denied any locking or popping and was given a prescription for Celebrex. At his November appointment, Plaintiff reported sharp left knee pain that radiated up his leg and mainly occurred when he was trying to stand up from a sitting position. Plaintiff also reported that sometimes it felt as if his knee would catch when he stood up from a chair. The doctor's impression was nondegenerative joint disease of the left knee and prescribed ibuprofen.

The ALJ conducted a hearing on January 15, 2009. Plaintiff testified his friend provided for him and did all the housework, although Plaintiff later admitted he could make his own lunch. Plaintiff denied doing anything outside except going to church, where he mainly would sit "for about an hour and a half" and denied standing up to sing. Plaintiff also stated on a typical day he would sit around the house, trying to read or watching TV, with his leg elevated above his waist. Plaintiff stated he had been elevating his leg for about 8 or 9 months after his doctor recommended he try it. When asked by the ALJ whether he could perform a job such as a security systems monitor, Plaintiff mentioned that he would need to elevate his leg and added he probably would

4

not qualify for such a job due to a prior drug charge.

A medical expert and a vocational expert also testified at the hearing. The medical expert stated Plaintiff suffered from mild degenerative arthritis of both knees and the lumbar spine. When asked to offer an opinion as to Plaintiff's residual functional capacity, the medical expert testified Plaintiff could perform sedentary work. The vocational expert testified to three unskilled jobs Plaintiff could perform at the sedentary level–an optical goods processor, a hand packager, and a document preparer. When asked by the ALJ to consider Plaintiff's need to elevate his knee, the vocational expert stated "[s]ome employers would let you elevate your knee" but that "[p]robably at waist level that might be difficult."

The ALJ issued a final decision denying Plaintiff benefits. In finding persuasive the opinion of the medical expert that Plaintiff could perform sedentary work, the ALJ considered the fact Plaintiff consistently complained of bilateral knee pain, but noted Plaintiff was a "younger individual" who had reported "no pain while sitting." Relying on Plaintiff's self-report and the medical expert's testimony, the ALJ further found that sedentary work would not exacerbate Plaintiff's pain. Based on the vocational expert's testimony, the ALJ concluded Plaintiff could perform jobs that existed in significant numbers in the national economy, resulting in a finding of not disabled.

## II. DISCUSSION

"[R]eview of [the Commissioner's] decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. *Forsythe v. Sullivan*, 926 F.2d 774, 775 (8th Cir. 1991). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a

5

reasonable mind might accept as adequate to support a conclusion. *Smith v. Schweiker*, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

Plaintiff argues the ALJ's assessment of his residual functional capacity is not supported by substantial evidence because it fails to include Plaintiff's need to elevate his leg while sitting. The residual functional capacity is the most an individual can do despite the combined effect of all their credible limitations. 20 C.F.R. §§ 404.1545, 416.945. The ALJ was responsible for determining Plaintiff's residual functional capacity "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [Plaintiff's] own description of [his] limitations.'" *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (citations omitted). "Although the ALJ must consider all relevant evidence . . . the record must contain at least some medical evidence to support the ALJ's determination of residual functional capacity." *Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010).

The only evidence Plaintiff needed to elevate his leg came from his own testimony he did this at the recommendation of his doctors to alleviate his pain. But there is no doctor's note in the record recommending Plaintiff elevate his leg. Most of Plaintiff's complaints associated his pain with activity and movement, not just sitting. And during Plaintiff's visit to his doctor in August 2008, he stated that "[i]f he is sitting and lying supine or watching TV, he has no pain." To the extent Plaintiff's report to his doctor and his later testimony were inconsistent, the ALJ had the responsibility to weigh the evidence and determine Plaintiff's residual functional capacity. *See* 20 C.F.R. § 416.927(c)(2) (stating agency will weigh internally inconsistent evidence to determine if claimant is disabled). The ALJ's determination is supported by substantial evidence, despite not including Plaintiff's alleged need to elevate his leg while sitting.[1]

Plaintiff similarly argues the ALJ's residual functional capacity is deficient because it does not include that he needs a cane to ambulate. SSR 96-9P is relevant to this issue. It states,

---

[1] The Court notes the ALJ's finding was consistent with Plaintiff's testimony that he sat in church for 1 1/2 hours at a time and White's statement Plaintiff spent most of the time with her sitting on the porch.

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).

SSR 96-9P.

Although Dr. Hamilton noted on June 10, 2008, Plaintiff "required" the use of a cane to ambulate, and Plaintiff was recorded to be walking with a cane during other visits, there is no medical documentation Plaintiff needed a cane to ambulate on a regular and continuing basis. *See* SSR 96-8P ("RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis.") The medical expert echoed this when she testified Plaintiff intermittently used a cane but she "did not see in the file that a treating source indicated that he would require consistent use of that."[2] Plaintiff even testified he did not use the cane when he was in his home. In determining Plaintiff's residual functional capacity, the ALJ was not required to include Plaintiff's use of a cane.

Plaintiff next argues the ALJ's credibility finding was not based on substantial evidence, complaining first that the ALJ failed to give specific reasons for not crediting White's third-party statements. The Eighth Circuit has held that "[w]hen an ALJ fails to believe lay testimony about a claimant's allegations of pain, he should discuss the testimony specifically and make explicit credibility determinations." *Ricketts v. Secretary of Health and Human Services*, 902 F.2d 661, 664 (8th Cir. 1990).

White stated Plaintiff was *limited* in his ability to lift, squat, bend, stand, walk, sit, kneel, and complete tasks, but she did not state Plaintiff was *unable* to do these things altogether. Most of the ALJ's residual functional capacity determination–which restricted Plaintiff to minimal standing, walking, and carrying requirements–was

---

[2] In discussing the medical expert's testimony, the ALJ wrote the medical expert "stated there was no basis for the claimant to consistently utilize a cane." Although this summary of the medical expert's testimony was not accurate, the fact remains no medical documentation established the need for Plaintiff to use a cane on a continuing basis.

consistent with White's statement of Plaintiff's limitations. *See* 20 C.F.R. §§ 404.1567(a); 416.967(a) (defining sedentary work). The ALJ could have found White's testimony mostly credible and still concluded Plaintiff could do sedentary work. *Cf. Bates v. Chater*, 54 F.3d 529, 533-34 (8th Cir. 1995) (holding ALJ could find wife's testimony quite credible, but not determinative, where her "testimony dealt with her husband's activities and mood swings, without detailing the nature and extent of his pain").

As for White's statement Plaintiff was limited in his ability to sit, the ALJ did not specifically discredit this assertion, but the ALJ did make an express determination Plaintiff had no pain while sitting based upon Plaintiff's own self-report to his doctor. In light of this determination, the ALJ did not need to expressly discredit White's statement that Plaintiff's ability to sit was limited.

Plaintiff also argues the ALJ failed to consider the side effects of the medication he was prescribed when the ALJ determined his credibility and residual functional capacity. Plaintiff's statements related to his prescription for Vicodin, which he complained made him tired and groggy. An ALJ is required to consider the side effects of medications in determining a claimant's credibility. *See Jones v. Astrue*, 619 F.3d 963, 975 (8th Cir. 2010). But the Eighth Circuit also has held an ALJ did not err in omitting medication drowsiness from a claimant's residual functional capacity where there was no evidence the side effect was uncontrollable or restricted the claimant's ability to work. *See Owen v. Astrue*, 551 F.3d 792, 801-02 (8th Cir. 2008). Here, Plaintiff was only prescribed narcotics for a limited time; he did not continuously take it or complain of side effects to his doctors. The medical records do not establish the existence of any side effect from any medication which lasted for a 12 month continuous period. The ALJ was not required to include Plaintiff's drowsiness in his determination of Plaintiff's residual functional capacity.

Plaintiff's last arguments center on his contention the ALJ's hypothetical to the vocational expert did not accurately detail Plaintiff's impairments. "A vocational expert's testimony constitutes substantial evidence when it is based on a hypothetical that accounts for all of the claimant's proven impairments." *Hulsey v. Astrue*, 622 F.3d 917,

922 (8th Cir. 2010).

In this context, Plaintiff again raises the use of a cane, the need to elevate his legs, and side effects of medications, which the Court already has discussed. Plaintiff also complains the ALJ's hypothetical did not include Plaintiff's ability to push and pull only occasionally with his left leg. But being able to push and pull leg controls "some" of the time is required for *light* work; sedentary work–as defined by the Commissioner–does not requiring pushing and pulling. *See* 20 C.F.R. §§ 404.1567(a)-(b); 416.967(a)-(b) (defining sedentary and light work). By limiting his hypothetical to sedentary work, the ALJ was asking the vocational expert to consider a worker not required to push and pull arm or leg controls.

Plaintiff also contends the ALJ's hypothetical was deficient because it failed to include the need to lie down throughout the day on several occasions and need to alternate sitting and standing every 15 minutes. But the Court is unable to find anywhere in the record where Plaintiff reported the need to lie down throughout the day or to alternate sitting and standing every 15 minutes. In fact, Plaintiff testified he sat in church for 1 1/2 hours, and he reported in his August 2008 pain questionnaire he could sit for about 30 minutes to 1 hour. The ALJ's hypothetical did not need to include impairments the record itself fails to disclose.

III. CONCLUSION

The Commissioner's decision is affirmed.
IT IS SO ORDERED.

DATE: November 30, 2010

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
UNITED STATES DISTRICT COURT

9